UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

The Estate of RANDEN HARVEY
and JACKIE GREEN,

      Plaintiffs,

v.                                        Case No. 08-14916
                                            Honorable Patrick J. Duggan

UNITED STATES OF AMERICA,

      Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on October 7, 2009.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                      U.S. DISTRICT COURT JUDGE

Plaintiffs bring this lawsuit against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80, asserting medical malpractice by doctors at the Ann Arbor Veterans Administration Medical Center allegedly resulting in the death of Randen Harvey. Presently before the Court is the Government's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), filed August 4, 2009. The motion has been fully briefed and, on October 1, 2009, this Court held a motion hearing.

**I.        Standard for Summary Judgment**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S. Ct. at 2513.

## II.     Factual Background Expert Evidence[1]

In November 2005, Randen Harvey was honorably discharged from the United States Marine Corps after serving two tours of duty in Iraq. Mr. Harvey was 23 years old at the time. Following his discharge, Mr. Harvey exhibited signs of emotional and psychological injury and was arrested on two separate occasions for Operating While Intoxicated ("OWI"). He eventually presented himself to the Ann Arbor Veterans Administration Medical Center ("AAVA") on March 31, 2006.

Mr. Harvey was diagnosed as suffering from alcohol and drug abuse, panic disorder with agoraphobia, post traumatic stress disorder ("PTSD"), and maladaptive personality traits. He was prescribed medication, including antidepressant and anti-anxiety medication, and scheduled for a complete psychological evaluation on May 3, 2006.

On the night of April 16, 2006, Mr. Harvey called a suicide hotline from his father's home in Farmington Hills, Michigan, where he was living. Mr. Harvey informed the hotline counselor that he "is suicidal and has ingested an excessive amount of pills such as Valium, Vicodin, and Klonopin." (Pl.'s Resp. Ex. 3.) He reported feeling depressed. (*Id*.) Farmington Hills police officers were dispatched to the home, where they found Mr. Harvey sitting on a loaded magazine clip, although no gun was located.

---

[1]The Government has filed a motion in limine to exclude the testimony of Plaintiff's expert, Dr. John Pankiewicz. In a separate opinion and order, this Court is denying that motion.

(*Id.*)  Mr. Harvey acknowledged to the officers that he had been drinking, but denied that he tried to kill himself or that he had taken any medications other than those prescribed to him in the proper amounts.  (*Id.*)

The police officers transported Mr. Harvey to Botsford Hospital in Farmington Hills, Michigan, where they completed a Petition/Application for Hospitalization form indicating that they believed Mr. Harvey was suffering from a mental illness and could "be reasonably expected within the near future to intentionally or unintentionally seriously physically injure [him]self or others and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation."  (Pl.'s Resp. Ex. 5.)  According to the police report, once at Botsford, Mr. Harvey admitted to taking numerous pills and alcohol in an attempt to end his life.  (*Id.* Ex. 4.)  He indicated that, in the future, "he would not call anyone and just kill himself."  (*Id.*)

To the Botsford physician who examined him, however, Mr. Harvey denied attempting suicide and indicated that he called the suicide hotline "just to talk."  (*Id.* Ex. 6.)  Although Mr. Harvey denied trying to hurt himself, he told the physician that he does have a gun and that he has thought about suicide due to extreme anxiety.  (*Id.* Ex. 7.)  The doctor concluded that Mr. Harvey was mentally ill and provided a diagnosis of "suicidal ideation."  (*Id.* Ex. 7.)  He therefore initiated commitment proceedings.  (*Id.*)  However, because Mr. Harvey was a veteran who received medical care through the Veterans Administration health system, Botsford arranged for Mr. Harvey to be transferred to the VA hospital in Detroit.

A staff psychiatrist at the Detroit VA hospital saw Mr. Harvey and noted that he "initially claimed he attempted suicide but retracted that statement." (Pl.'s Resp. Ex. 8.) Mr. Harvey denied current suicidal ideation and claimed that he stopped marijuana and drug use fourteen days earlier. (*Id.*) 0n April 18, 2006, after spending a day at the Detroit VA hospital, Mr. Harvey was discharged.

The following day, Mr. Harvey contacted the AAVA to clarify his medication regimen. (Pl.'s Resp. Ex. 1.) Mr. Harvey informed the psychiatric social worker that he had a panic attack on April 16, which prompted him to contact a suicide hotline. (*Id.*) Mr. Harvey indicated that he "had no intention of committing suicide but didn't have anyone to talk with and settle down from the panic attack."

Mr. Harvey subsequently was accepted into the AAVA's "High Intensity Outpatient Treatment Program" ("HIOT"). In HIOT, patients receive intensive group and individual therapy, up to six hours per day, five days a week, for several weeks. The program focuses on substance abuse treatment, in addition to coping skills and anger management. Participants are prohibited from alcohol and non-prescribed drugs and use of either could lead to immediate dismissal from the program. Participants in the program are monitored regularly by physicians, nurses, and social workers to assess their condition and progress. During these evaluations, Mr. Harvey endorsed passive suicidal thoughts but denied any active suicidal thoughts, suicidal intent or plan or past suicidal attempts. (Def.'s Mot. Ex. 1 ¶ 8.)

Mr. Harvey began his participation in HIOT on May 16, 2006. On his third day in

5

the program, Mr. Harvey tested positive for cocaine; nevertheless, he was not discharged from the program. As part of the program, Mr. Harvey obtained housing in a VA-provided apartment near the AAVA. Due to problems with his roommate, however, Mr. Harvey temporarily moved-in with his mother, at which time he experienced a panic attack, consumed alcohol, and was arrested for disorderly conduct and a noise violation. He still was not discharged from the program, but instead was provided a room in a portion of the AAVA called the "Hoptel." His contract to live at the Hoptel, like his agreement to participate in HIOT, required Mr. Harvey to refrain from alcohol and illicit drug use.

On Sunday, June 11, 2006, at around 8:30 p.m., Mr. Harvey presented himself to the emergency department at the AAVA and indicated that he "thinks he might jump off the roof or put a hose in his car exhaust and into the car." (Pl.'s Resp. Ex. 22.) At this time, Mr. Harvey had a breathalyzer of 0.044. For some unknown reason, Mr. Harvey was not retained in the emergency department at this time.

At approximately ten o'clock that evening, AAVA police received a report of a man outside "on the roof of the 4th floor." (Pl.'s Resp. Ex. 23.) The officers responded and saw Mr. Harvey outside on the roof of the 4th floor. (*Id*.) One of the officers eventually met up with Mr. Harvey, who by that point had traveled to the 6th floor of the Hoptel. (*Id.*) The officers informed Mr. Harvey of the hospital's policy on restricted areas and released him after he indicated he would comply with that policy. (*Id.*) The officers' supervisor subsequently instructed the officers to search Mr. Harvey's room.

(*Id.*) In their search, the officers discovered empty beer and vodka containers (four forty-ounce bottles of beer and a pint of vodka). (*Id.*; Ex. 24.) Mr. Harvey was not in the room. (*Id.*) The officers subsequently found him in the emergency department at 12:48 a.m. on June 12. (*Id.*)

At that time, Dr. Christina Mueller conducted a psychiatric consult of Mr. Harvey. (Pls.' Resp. Ex. 24.) Mr. Harvey told Dr. Mueller: "he got stuck between 2 floors on the elevator and so broke a window and climbed to the outside of the building. He states that he then jumped onto an aqueduct which broke and then climbed up the fire escape to the roof." (*Id.*) Mr. Harvey "denied that this action was a suicide attempt" and indicated that "he is not currently suicidal and has no [history of] suicide attempts." (*Id.*) However, he also told the doctor that "he often thinks that things would be 'so much easier if he wasn't here'" and that "he is 'at the end of [his] rope' which makes him want to 'go to Texas for 7 years' so that he will not have to serve jail time for his violations."[2] (*Id.*) A breathalyzer at this time registered more than .08. (*Id.*)

Emergency department personnel then contacted a HIOT representative, who indicated that Mr. Harvey is to be ejected from the program due to his violation of the HIOT and Hoptel contracts (alcohol use). (*Id.*) Mr. Harvey was instructed to leave the facility, but return the following morning so that "further treatment [recommendations] could be provided." (*Id.*) The VA officers then followed Mr. Harvey to his Hoptel room

---

[2]Mr. Harvey had an upcoming court date for one of his OWI charges.

so he could pack his bags. (Pl.'s Resp. Ex. 24.) The officers subsequently escorted Mr. Harvey off the property. (*Id.*)

Later that morning, at approximately 9:30 a.m. on June 12, Mr. Harvey reported to the HIOT staff. (Pls.' Resp. Ex. 26.) He told Deborah Amaya, a social worker: "Deb, I wasn't suicidal last night but I am now. I am not going to jail." (*Id.*) In response, James Glover, a registered psychiatry nurse in the HIOT program and Mr. Harvey's case manager, asked Mr. Harvey if he could accept inpatient treatment. (*Id.*) Mr. Harvey responded: "Jim, you know I will not be locked up and treated like a child." (*Id.*) Based on Mr. Harvey's statements to Ms. Amaya, the medical staff decided to bring him to Dr. Brian Martis, a psychiatrist who had been seeing Mr. Harvey through the AAVA's PTSD Clinic. (*Id.*)

Dr. Martis reported that he met with Mr. Harvey from 9:30 to 10:30 in the morning on June 12, 2006. (Pl.'s Resp. Ex. 28.) Mr. Harvey informed Dr. Martis that he was "feeling depressed, ashamed, and somewhat hopeless about his situation." (*Id.*) Mr. Harvey was able "to identify some reasonable goals, but unable to articulate what he needs to do to realistically achieve these goals." (*Id.*) Dr. Martis and Mr. Harvey discussed different treatment options for Mr. Harvey and the possibility of a social work consult to help him arrange transportation to treatment. (*Id.*)

Dr. Martis noted that he "addressed suicidality/homicidality carefully" and that Mr. Harvey indicated that "he feels quite bad about his situation and has occasional passive [suicidal ideations] when he thinks about his situations." (*Id.*) However, Mr.

8

Harvey denied active suicidal or homicidal ideations, intent or plans at that time. (*Id*.) Dr. Martis noted that Mr. Harvey "is in distress and has limited insight and at risk for making choices such as abusing substances that have a high probability of painful consequences," declined "acute inpatient stay," and "is not certifiable." (*Id*.) Mr. Harvey was released with the plan that he would go live with his father in Farmington Hills, start attending Alcoholics Anonymous daily, continue his medications, and that he would follow-up on a consult for placement in a residential substance abuse treatment program. (*Id*.) Dr. Martis asked AAVA Clinical Nurse Specialist Steve Gentz to follow-up with Mr. Harvey and help facilitate his placement in the Battle Creek VA residential Substance Dependence Unit. (Def.'s Mot. Ex. 9 ¶ 3.)

Mr. Gentz attempted to reach Mr. Harvey on the latter's cell phone on Monday, June 12 (the day Mr. Harvey left the AAVA facility). (*Id*. ¶ 4.) A message indicated that the phone number had been disconnected. (*Id*.) That evening, Mr. Gentz called Mr. Harvey's father, Kevin Harvey, who indicated that Mr. Harvey was taking a bus back to Detroit from Ann Arbor and would not be home until the next morning. (*Id*.) Kevin Harvey indicated that he would have his son call Mr. Gentz to arrange treatment and he took Mr. Gentz' number. (*Id*.)

When Mr. Harvey failed to return Mr. Gentz' phone call by Friday morning, June 16, Mr. Gentz called Kevin Harvey's residence. (*Id*. ¶ 6.) At this time, Kevin Harvey informed Mr. Gentz that Mr. Harvey had killed himself. (*Id*.) Kevin Harvey had returned home from work at around 5:30 p.m. on June 15, and found Mr. Harvey dead or nearly

9

dead in the bathroom. Kevin Harvey immediately called 911.

When the Farmington Hills Police Department arrived, they found Mr. Harvey nude, lying on the bathroom floor. (Pl.'s Resp. Ex. 32.) There was blood smeared on the outside of the bathtub and spattered on the walls just above the tub. (*Id*.) The officers observed numerous superficial lacerations (small holes) to Mr. Harvey's legs and upper left chest and an apparent self-inflicted laceration to his left wrist, but no other signs of trauma. (*Id*.) Two pairs of scissors were found in the bathroom, along with an empty bottle of vodka, a shaving razor cartridge, and a razor knife. (*Id*.) Inside Mr. Harvey's bedroom, the officers located several empty prescription bottles which originally had been prescribed in April by the VA hospital in Detroit. (*Id*.) The officers further located prescription pills packaged inside a coin baggie, several baggies containing marijuana residue, and loose marijuana. (*Id*.) Mr. Harvey's body was removed for an autopsy at the Oakland County Office of the Medical Examiner. (*Id*.)

The medical examiner's autopsy report identifies the cause of Mr. Harvey's death as drug abuse, and the manner of death as "undeterminable." (Def.'s Mot. Ex. 11.) The report identifies various scars on Mr. Harvey's body, including the following: vertical scars on the lower rib cage measuring up to 4" in length; a 3" vertical midepigastric scar; scars on the left upper arm, measuring up to 1 1/4" in length; 1" horizontal scar on the lateral aspect of the left wrist, with a depth of 1/8"; a 3/4" horizontal scar on the lateral aspect of the right hand just below the right wrist, with a depth of 1/16"; a 1" superficial cut on the right upper arm; multiple superficial cuts on the left arm, measuring up to 2" in

length; and multiple new and old abrasions on the front of the leg, measuring up to 4" in length. (*Id.*) No major blood vessels were injured. (*Id.*) A toxicology report detected alcohol in Mr. Harvey's system, as well as the following drugs: Benzoylecgonine (byproduct of cocaine), cocaine, MDMA ("Ecstasy"); methamphetamine and amphetamine, anhydroecgonine methyl ester (a byproduct of crack cocaine or cocaine); citalopram (one of Mr. Harvey's prescriptions), and desmethylcitalopram (another prescription). (*Id.*)

Dr. Bernardino Pacris, who performed the autopsy, states in an affidavit that, given the drugs and alcohol identified in Mr. Harvey's system, the cause of death was determined to be drug abuse. (Def.'s Mot. Ex. 12.) Dr. Pacris further states that it was not possible to determine the manner of Mr. Harvey's death (i.e. whether it was intentional or unintentional), but that Mr. Harvey did not die from the self-inflicted wounds to his arms, abdomen, or other exterior areas of the body. (*Id.*) These conclusion are shared by Dr. Mueller (the psychiatrist who treated Mr. Harvey at the AAVA emergency department in the early hours of June 12) and the Government's expert, Dr. Elissa P. Benedek. (Def.'s Mot. Exs. 8, 13.)

Having reviewed the medical examiner's autopsy and toxicology reports, Dr. Mueller states: "Given the absence of a suicide note, and/or statements of his intention at the time of his death, it is impossible to know if [Mr. Harvey] sought to end his life." (*Id.* Ex. 8 ¶ 9.) Based on the autopsy and toxicology reports and Mr. Harvey's VA medical file, Dr. Benedek opines that Mr. Harvey's death was caused by drug overdose and

whether the overdose was intentional is not determinable. (*Id.* Ex. 13 ¶¶ 2, 3.)

Dr. Benedek further provides that in her expert opinion, Drs. Martis' and Mueller's evaluations of Mr. Harvey preceding his death fully conformed to the standard of medical care. (*Id.* ¶¶ 4, 5.) With respect to Dr. Martis, Dr. Benedek indicates:

> Dr. Martis reasonably concluded that involuntary commitment was not the best course of action for Mr. Harvey on [June 12, 2006]. Dr. Martis specifically considered whether Mr. Harvey had suicidal intentions, and reasonably concluded he did not. He arrived at a treatment plan to address Mr. Harvey's substance abuse problem.

(*Id.* ¶ 4.) As to Dr. Mueller, Dr. Benedek opines:

> Dr. Christina Muller's evaluation of Mr. Harvey on June 12, 2006 also fully conformed to the standard of medical care. Dr. Mueller [sic] evaluation of Mr. Harvey included consideration of suicidal intentions. He denied suicidal intentions to her. She reasonably concluded he was not suicidal. Mr. Harvey followed Dr. Mueller's instructions to return to the Ann Arbor VA hospital for further evaluation.

(*Id.* ¶ 5.) Dr. Benedek agrees with Drs. Mueller and Martis that Mr. Harvey did not require involuntary commitment, noting that he had been monitored for suicidal and homicidal intentions repeatedly over the course of his participation in HIOT and consistently denied suicidal intentions. (*Id.* ¶ 6.)

Plaintiff's medical expert, Dr. John Pankiewicz, disagrees. Dr. Pankiewicz believes that there were risk factors that Drs. Mueller and Martis ignored in accepting Mr. Harvey's denial of suicidal ideations, such as the fact that he appeared at the emergency department threatening to jump off a roof, subsequently was reported to be on the roof of

12

the AAVA, had a known substance abuse problem and mental illness, was unemployed and facing incarceration, was legally intoxicated thus affecting his impulse control, and stated that he often thinks that things would be so much easier if he is not here.  (Pl.'s Resp. Ex. 35 at 49-63.)  In his report, Dr. Pankiewicz writes:

> Mr. Harvey disclaimed suicidal intent and gave an explanation of how he had somehow been caught in an elevator and was trying to make his way out the building, necessitating climbing up onto the roof.  Although this is a possible scenario, an intoxicated individual with major mental illness who had recently made threats of jumping off a roof would direct a reasonable provider of medical or mental health care to detain Mr. Harvey for his own safety.

(Pl.'s Resp. Ex. 36 at 3-4.)

At his deposition in this case, Dr. Pankiewicz noted Dr. Martis' own assessment that Mr. Harvey had limited insight and was at high risk for making choices, such as abusing substances, that had a high probability of painful consequences.  (*Id*. Ex. 35 at 71.)  In his report, Dr. Pankiewicz further cites Dr. Martis' conclusion that Mr. Harvey was in need of acute inpatient treatment and offer of voluntary hospitalization and Dr. Martis' note that Mr. Harvey was depressed, upset, anxious with a reduced range of reactivity, his frustration about his situation, and sense of worthlessness.  (*Id*. Ex. 36 at 4.)  According to Dr. Pankiewicz, "[i]f Dr. Martis believed Mr. Harvey needed inpatient treatment, he should have made an effort to involuntarily hospitalize Mr. Harvey given Mr. Harvey's pattern of deteriorating mental health and acute symptoms, as well as repeated expressions of suicidal ideation."  (*Id*.)

### III.   Government's Arguments and Analysis

The Government contends that summary judgment is warranted because Plaintiffs cannot show that Mr. Harvey committed suicide or that the AAVA medical staff (specifically Drs. Mueller and Martis) engaged in medical malpractice by failing to involuntarily commit Mr. Harvey on June 11 or 12, 2006.  More specifically as to the first argument, the Government contends that because Plaintiffs allege that the medical staff tortiously failed to prevent Mr. Harvey's suicidal death, they must show that his death was a suicide.

This Court believes that Plaintiffs present sufficient evidence to create a genuine issue of material fact with respect to whether Mr. Harvey's death was intentional.  Their expert opines, and the Court believes there is evidence from which a reasonable jury could conclude, that Mr. Harvey intended to seriously harm himself and/or cause his own death.

This evidence includes the fact that Mr Harvey suffered from a number of mental illnesses, including alcohol and drug abuse, and that he was distressed because of his unemployment and impending jail time resulting from OWIs and a probation violation. Further, he called a suicide hotline indicating that he was suicidal and had ingested an excessive amount of medication on April 16, 2006; and when officers arrived at his home, Mr. Harvey was found sitting on a loaded magazine clip.  Although denying that he tried to kill himself, Mr. Harvey later admitted that he consumer numerous pills and alcohol in an attempt to end his life and that he would not call anyone in the future and just kill

14

himself. Mr. Harvey also denied to a Botsford physician that he tried to hurt himself, but he indicated that he had thought about suicide due to extreme anxiety and had a gun. Moreover, Mr. Harvey reported to the AAVA emergency department one month later with a blood alcohol level of .044 and stating that he might jump off a roof or put a hose in his car exhaust and into his car. Soon after, he was reported to be on the roof of the AAVA and had a blood alcohol level of .08. Mr. Harvey denied current suicidal thoughts and past suicide attempts, but his medical records reflected something different and he also stated at the time that he was "at the end of [his] rope" and "often thinks that things would be 'so much easier if he wasn't there.'" Finally, the autopsy report shows that Mr. Harvey had numerous self-inflicted wounds on various parts of his body (including his wrists) and had ingested alcohol and various drugs (prescription and non-prescription).

The Court further concludes that Plaintiffs present evidence to create a genuine issue of material fact with respect to whether the AAVA medical staff breached the appropriate standard of care. Under Michigan law, a person may be involuntarily committed if the person has a mental illness and, because of the mental illness, can reasonably be expected in the near future to intentionally *or unintentionally* seriously physically injure himself and the person "has engaged in an act or acts or made significant threats that are substantially supportive of the expectation." Mich. Comp. Laws § 330.1401(1)(a) (emphasis added). The Government's expert, Dr. Benedek, opines that the medical staff acted in accordance with the standard of care in deciding not to commit Mr. Harvey. Plaintiff's expert, Dr. Pankiewicz, concludes that it was medical

malpractice not to commit Mr. Harvey because the evidence before Drs. Mueller and Martis indicated that he had a mental illness, reasonably could be expected to intentionally or unintentionally seriously injure himself because of his mental illness, and had engaged in recent acts substantially supportive of the expectation. Summary judgment therefore is not appropriate.

 Accordingly,

 **IT IS ORDERED**, that Defendant's motion for summary judgment is **DENIED**.

        s/PATRICK J. DUGGAN
        UNITED STATES DISTRICT JUDGE

Copies to:
Thomas F. Campbell, Esq.
Kristina L. Derro, Esq.
Steven P. Croley, Esq.